Jeremy J. Taylor (SBN 249075)
Karan Singh Dhadialla (SBN 296313)
**BAKER BOTTS L.L.P.**
101 California Street, Suite 3600
San Francisco, California 94111
Phone: (415) 291-6200
Fax: (415) 291-6300
jeremy.taylor@bakerbotts.com
karan.dhadialla@bakerbotts.com

Syed K. Fareed (admitted *pro hac vice*)
Clark Oberembt (admitted *pro hac vice*)
**BAKER BOTTS L.L.P.**
98 San Jacinto Blvd #1500
Austin, Texas 78701
Phone: (512) 322-2500
Fax: (512) 322-2501
syed.fareed@bakerbotts.com
clark.oberembt@bakerbotts.com

Danny David (admitted *pro hac vice*)
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas 77002
Phone: (713) 229-4055
Fax: (713) 229-2855
danny.david@bakerbotts.com

*Attorneys for Plaintiff/Counterclaim Defendant*, LYFT, INC.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**(Oakland Division)**

| | |
|---|---|
| LYFT, INC., <br><br> Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> QUARTZ AUTO TECHNOLOGIES LLC, <br><br> Defendant/Counterclaim Plaintiff. | Case No. 4:21-cv-01871-JST <br><br> **LYFT, INC.'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS OF INVALIDITY UNDER 35 U.S.C. § 101** <br><br> Judge:     Hon. Jon S. Tigar <br> Date:      March 17, 2022 <br> Time:     2:00 p.m. <br> Crtrm:    6 – 2nd Floor |

BAKER BOTTS L.L.P.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER BOTTS L.L.P.

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    QUARTZ MISSTATES AND MISAPPLIES THE LAW ............................. 1

III.   THE PATENTS ARE INVALID UNDER § 101 ...................................... 4

     A.      The '443 Patent Claims Patent-Ineligible Subject Matter ....................... 4

          1.     The Claims Are Directed to an Abstract Idea ............................ 4

          2.     The Claims Lack an Inventive Concept ..................................... 6

          3.     Claim 1 Is Representative ......................................................... 7

     B.      The '871 Patent Claims Patent-Ineligible Subject Matter ....................... 8

          1.     The Claims Are Directed to an Abstract Idea ............................ 8

          2.     The Claims Lack an Inventive Concept ..................................... 10

          3.     Claim 10 Is Representative ....................................................... 11

     C.      The '215 Patent Claims Patent-Ineligible Subject Matter ....................... 11

          1.     The Claims Are Directed to an Abstract Idea ............................ 11

          2.     The Claims Lack an Inventive Concept ..................................... 15

          3.     Claim 5 Is Representative ......................................................... 16

     D.      The '275 Patent Claims Patent-Ineligible Subject Matter ....................... 17

          1.     The Claims Are Directed to an Abstract Idea ............................ 17

          2.     The Claims Lack an Inventive Concept ..................................... 20

IV.   CONCLUSION ................................................................................................ 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER BOTTS L.L.P.

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) ........................................................................................... 2, 12

*Affinity Labs of Tex., LLC v. DIRECT TV, .LLC*,
  838 F.3d 1253 (Fed. Cir. 2016) ............................................................................................. 4, 6

*Alice Corp. Pty. v. CLS Bank Int'l*,
  573 U.S. 208 (2014) ............................................................................................................ *passim*

*Ancora Techs., Inc. v. HTC Am., Inc.*,
  908 F.3d 1343 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) ............................................. 15

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
  687 F.3d 1266 (Fed. Cir. 2012) ........................................................................................ 15, 17

*Berkheimer v. HP, Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ................................................................................................. 3

*British Telecomms. PLC v. IAC/InterActiveCorp*,
  No. 18-366-WCB, 2019 U.S. Distx. LEXIS 17269 (D. Del. Feb. 4, 2019) .............................. 3

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018) ................................................................................... 3, 7, 17, 20

*C.R. Bard Inc. v. AngioDynamics, Inc.*,
  979 F.3d 1372 (Fed. Cir. 2020) ............................................................................................... 19

*CardioNet, LLC v. InfoBionic, Inc.*,
  955 F.3d 1358 (Fed. Cir. 2020), *cert denied*, 141 S. Ct. 1266 (2021) ....................... 3, 4, 9, 19

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
  935 F.3d 1341 (Fed. Cir. 2019) ......................................................................................... 2, 8, 9

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*,
  15 F. 4th 1091 (Fed. Cir. 2021) .......................................................................................... 3, 10

*Data Engine Techs. LLC v. Google LLC*,
  906 F.3d 999 (Fed. Cir. 2018) ................................................................................................. 15

*Diamond v. Diehr*,
  450 U.S. 175 ............................................................................................................................... 4

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1351(Fed. Cir. 2016) ........................................................................................... *passim*

*Fitbit Inc. v. AliphCom*,
   No. 16-CV-0118-BLF, 2017 WL 819235 (N.D. Cal. Mar. 2, 2017) ...................................... 18

*Free Stream Media Corp. v. Alphonso Inc.*,
   996 F.3d 1355 (Fed. Cir. 2021) ......................................................................................... 2

*Intel. Ventures I LLC v. Capital One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015) ......................................................................................... 8

*Intellectual Ventures I LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016) ................................................................................. 2, 4, 6

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
   566 U.S. 66 (2012) ........................................................................................ 4, 15, 17, 19

*Merad, Inc. v. MRI Devices Corp.*,
   401 F.3d 1313 (Fed. Cir. 2005) ....................................................................................... 18

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
   719 F.3d 1346 (Fed. Cir. 2013) ....................................................................................... 18

*Packet Intelligence LLC v. NetScout Sys., Inc.*,
   965 F.3d 1299 (Fed. Cir. 2020) ....................................................................................... 15

*PersonalWeb Techs. LLC v. Google LLC*,
   8 F.4th 1310 (Fed. Cir. 2021) .................................................................................... 10, 11

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
   696 F. App'x 1014 (Fed. Cir. 2017) .................................................................................. 7

*SAP America, Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ..................................................................................... 6, 9

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
   873 F.3d 905 (Fed. Cir. 2017) ......................................................................................... 10

*Synopsys, Inc. v. Mentor Graphics Corp.*,
   839 F.3d 1138 (Fed. Cir. 2016) ............................................................................ 2, 5, 6, 12

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020) .................................................................................. 2, 15

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017) .................................................................................. 4, 12

*Uniloc USA, Inc. v. ADP, LLC*,
   772 F. App'x 890 (Fed. Cir. 2019) ................................................................................ 3, 9

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*,
   916 F.3d 1363 (Fed. Cir. 2019) ....................................................................................... 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Yu v. Apple Inc.*,
  1 F.4th 1040 (Fed. Cir. 2021) ................................................................................................................... 2

## I.      INTRODUCTION

In an attempt to avoid ineligibility under § 101, Quartz resorts to challenging the "current state of the law" and argues—without substantiation and primarily through citation to dissenting opinions—that it is "contrary to Supreme Court precedent." Opp. 1. Quartz is wrong, and in arguing for patent eligibility, it asks the Court to ignore uncontroverted precedent on § 101.

Quartz's patent-eligibility arguments are flawed for three fundamental reasons. *First*, Quartz focuses on details from the specification rather than the claims. *Second*, Quartz misunderstands the use of analogies in the § 101 inquiry. *Third*, Quartz improperly injects novelty and obviousness-type analyses into the § 101 inquiry.

The § 101 inquiry is focused on what is actually **claimed**. First, asking whether the **claim** is directed to an abstract idea, and second, whether the **claim** recites an inventive concept significantly more than the abstract idea. Without doing so, Quartz argues that Lyft misapprehends the patents— spending pages of its opposition providing "context" for each patent, criticizing Lyft's analogies for not capturing details in the specifications, and restating dependent claims without analysis. Quartz's efforts are misplaced. Its rewording of the patents does nothing to alter the analysis, and in most cases Quartz and Lyft appear to largely agree on what the challenged claims are directed to. As Lyft's Motion demonstrates, the asserted claims are directed to abstract ideas, regardless of unclaimed details discussed in the specification and in light of the admitted state of the art at the time. They also lack, and Quartz has not articulated any, inventive concept sufficient to render them patent eligible. The Court should thus find the claims ineligible under § 101 as a matter of law.

## II.     QUARTZ MISSTATES AND MISAPPLIES THE LAW

The § 101 inquiry is focused on the **claims**. First, asking whether a **claim** is directed to an abstract idea, and second, whether the **claim** recites an inventive concept that is "significantly more" than the abstract idea itself. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014).

Quartz makes three principal legal errors. *First*, it improperly relies on unclaimed aspects from the patent specifications to argue that the claims are eligible. This approach—of emphasizing the specification over the claims—is wrong and has been wholly rejected. "[W]hile the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the

Baker Botts L.L.P.

1    specification must also yield to the claim language in identifying that focus."  *Chamberlain Grp.,*

2    *Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1346 (Fed. Cir. 2019).  Thus, "details from the

3    specification cannot save a claim directed to an abstract idea that recites generic computer parts."

4    *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) (citing *Accenture*

5    *Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013).[1]

6         *Second*, Quartz misunderstands the role that analogies play in illustrating that a claim is

7    directed to an abstract idea such as a longstanding human practice or steps that may be performed

8    on paper or in the mind.  *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317–

9    18 (Fed. Cir. 2016) (explaining that analogies are "useful" at step one).  Quartz complains that Lyft's

10   analogies fail to capture generic computer components and functionality, specific technological

11   environments, or the elements of dependent claims.  These arguments miss the point.  Analogies are

12   not meant to track every limitation word-for-word; rather, they are useful to illustrate the abstract

13   idea at the core of the claims by focusing on the underlying idea and not the generic computer

14   components.  *Id.*  Courts routinely look to such analogies in § 101 analysis.  For example, in

15   *Intellectual Ventures I*, the Court found useful "the district court's analogy to a corporate mailroom"

16   and an analogy to "a brick-and-mortar post office" with humans performing similar method steps

17   because those analogies "demonstrate[] that the concept" the claims were directed to "is well-known

18   and abstract," apart from the "generic computer implemented steps."  *Id.*  The Court found the

19   claimed methods analogous to such longstanding human practices and held the claims unpatentable.

20   *Id.*  The fact that the claims recited generic components (e-mail, computer network, database, rule

21   engine, etc.) and their functionalities did not detract from the analogies' usefulness.  *Id.*

22        *Third*, Quartz incorrectly argues that Lyft should have addressed the full scope of the prior

23   art as part of the § 101 analysis.  Federal Circuit precedent, however, is clear that the Court can

24   undertake a § 101 analysis at the pleading stage based solely on the patent itself.  "[N]ot every § 101

25   determination contains genuine disputes over the underlying facts material to the § 101 inquiry."

---

[1] *See also Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021) (noting the focus of the § 101 inquiry is "on the language of the asserted claims themselves") (quoting *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (alterations omitted); *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1364–65 (Fed. Cir. 2021) (holding that a claim is directed to an abstract idea where there is nothing in the claims that demonstrate an improvement to computer functionality, even where the specification provides details on how to achieve a result).

1   *Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (acknowledging that "[p]atent

2   eligibility has in many cases been resolved on motions to dismiss"); *see also British Telecomms.*

3   *PLC v. IAC/InterActiveCorp*, No. 18-366-WCB, 2019 U.S. Distx. LEXIS 17269, at *66 (D. Del.

4   Feb. 4, 2019) (collecting cases showing the Federal Circuit has approved of district courts deciding

5   § 101 on motions to dismiss, including in cases post-dating the decision in *Berkheimer*).

6          Contrary to Quartz's insistence otherwise, "step one of the *Alice* framework does not require

7   an evaluation of the prior art or facts outside of the intrinsic record regarding the state of the art at

8   the time of the invention" and "[n]either *Bilski*, *Alice*, nor this court's precedent endorses such an

9   analysis." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1374 (Fed. Cir. 2020), *cert denied*,

10  141 S. Ct. 1266 (2021). Similarly, regarding step two, "[w]hether a combination of claim limitations

11  supplies an inventive concept that renders a claim 'significantly more' than an abstract idea to which

12  it is directed is a question of law." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed.

13  Cir. 2018). Although this inquiry ***can*** involve underlying factual determinations regarding what

14  was well-understood, routine, and conventional, it need not when, as here, the intrinsic record admits

15  what was known and conventional and the only alleged inventive concept relies on the abstract idea

16  itself. *See id*. at 1286, 1290–91 (finding irrelevant whether an alleged inventive concept was

17  unconventional when it just restates the abstract idea using generic components in their ordinary

18  manner as confirmed by the specification). Eligibility requires "significantly more." *Id*.

19         Quartz's citation—without discussion—to *CosmoKey* to suggest otherwise is unfounded.

20  Opp. 10, 16, 23, and 28. In *CosmoKey*, the Federal Circuit found an inventive concept where the

21  ***claims*** were ***specific*** and went ***beyond the abstract idea***—none of which apply here. *See CosmoKey*

22  *Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F. 4th 1091, 1099 (Fed. Cir. 2021). *CosmoKey* is also

23  inapposite because there, unlike here, the intrinsic record did not describe features as conventional.

24  *Id*. at 1095. Thus, *CosmoKey* does not require the showing, as Quartz contends, that components

25  are known and conventional in the prior art. *Id*. Also, this Court has no obligation to look beyond

26  the patent to determine whether it has overcome prior art in unconventional ways for purported

27  advancements not claimed. *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 900 (Fed. Cir. 2019).

28         In fact, Federal Circuit precedent is consistent with the Supreme Court's guidance not to

1    "substitute §§ 102, 103, and 112 inquiries for the better-established inquiry under § 101." *Mayo*

2    *Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 91 (2012). "Indeed, 'the novelty of

3    any element or steps in a process, or even of the process itself, is of no relevance in determining

4    whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject

5    matter.'" *Intell. Ventures*, 838 F.3d at 1307, 1315 (quoting *Diamond v. Diehr*, 450 U.S. 175, 188–

6    89) (alterations omitted).[2]  Quartz appears to acknowledge as much.  Opp. 1 (noting that novelty is

7    "wholly apart from whether the invention falls into a category of statutory subject matter"), 3 (noting

8    the "inventive conceptive [sic] inquiry . . . is not an obviousness analysis").  While criticizing Lyft

9    as failing to address prior art—which is unnecessary—Quartz invites the Court to engage in its own

10   novelty and obviousness analysis .  *See, e.g.*, Opp. 5–6, 13–14, 16–18, 20, 23, 25–28.  The Court

11   should reject Quartz's invitation to do so.  *See CardioNet*, 955 F.3d at 1373 ("[W]e reserve for

12   §§102 and 103 purposes our comparison of the prior art and the claims to determine if the claims

13   are, in fact, an improvement over the prior art.").

14   **III.    THE PATENTS ARE INVALID UNDER § 101**

15          **A.    The '443 Patent Claims Patent-Ineligible Subject Matter**

16          The parties agree on what these claims are directed to.  Quartz characterizes the '443 Patent

17   as directed to a "method for automatically determining when multiple users of cell phones are in the

18   same region, providing them with a common meeting point, and notifying them accordingly."  Opp.

19   5.  Other than the addition of unclaimed limitations (e.g., "automatically" and "cell phones"), that

20   is nearly identical to the abstract idea proposed by Lyft: notifying someone they are in the same area

21   as someone else and determining a common meeting point.  Mot. 3. These functional, result-oriented

22   claims contain no inventive concept that is significantly more than that idea.

23                **1.    The Claims Are Directed to an Abstract Idea**

24          The '443 Patent claims are as abstract as they come.  Rather than focus on the claim

25   language, as required for a § 101 analysis, Quartz complains about Lyft's analogies and argues,

26   without explanation, that the claims recite improved "functionality of cell phones."  Opp. 5.  In

27   _____
     [2] *See also Affinity Labs of Tex., LLC v. DIRECT TV, .LLC*, 838 F.3d 1253, 1263 n. 3 (Fed. Cir. 2016)
28   ("The eligibility finding does not turn on [] novelty . . . ."); *Two-Way Media Ltd. v. Comcast Cable
     Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) ("Eligibility and novelty are separate
     inquiries.")

1   doing so, Quartz commits a fundamental error of § 101 analysis by focusing on the patent

2   specification and alleged "benefits" of the purported invention as opposed to what is ***claimed***.

3   Throughout its opposition, Quartz relies on a number of unclaimed limitations purportedly

4   from the specification.  Specifically, Quartz includes the following limitations in its discussion of

5   the claims: performing steps "automatically" (Opp. 5); allowing users to have "multiple group

6   memberships" (Opp. 6); analyzing rate and direction of travel to determine whether a user will enter

7   a region (Opp. 6); determining whether a user is "out of view" of another user (Opp. 7); determining

8   location on an "ongoing basis" (Opp. 7–8); and determining that a device "has moved into a region

9   near [a] first device" (Opp. 11).  But none of these features are ***claimed*** and, as such, they have no

10  place in the § 101 inquiry.  *Synopsys, Inc.*, 839 F.3d at 1149 ("Complex details from the specification

11  cannot save a claim directed to an abstract idea that recites generic computer parts.")

12  The claims recite no limitations on how location data is collected.  It does not have to be

13  done "automatically," on an "on-going basis," or by use of "GPS-enabled" phones, as Quartz

14  appears to contend through improper reliance on the specification.  Opp. 5–7.  Location can be

15  obtained by any means in these entirely functional claims—including calling someone and asking

16  where they are or just observing people move around.  The location information is not even required

17  to come *from* the "portable communication device."  In fact, the only limitation that requires the use

18  of the claimed communication devices is notifying the users "on" each device.  And the specification

19  states that "radio frequency signals" can be used for that.  '443 Patent at 5:53-56.  In any event,

20  Quartz admits that "using GPS to locate a portable communication device was known."  Opp. 10.

21  Even assuming GPS-enabled devices were required to determine locations and notify people, those

22  are simply the ordinary functions of such devices.  With location data in hand, the remainder of the

23  claims could be performed with a pen and paper map.  Indeed, humans have determined each other's

24  locations, that they were near each other, and a place to meet up for a long time, and they have been

25  doing so using portable radios since at least World War II.  Mot. 5–6.

26  Quartz, relying on unclaimed limitations, argues that Lyft's analogies are inapt.  Quartz

27  argues—without support—that Lyft's World War II analogy is inaccurate because the claims require

28  locations to be determined on an ongoing basis.  Opp. 7–8.  That is not ***claimed***.  But even if it were,

1   the analogy still holds as the commander directing the groups of soldiers could, and most likely

2   would, receive updates on the soldiers' positions as they push forward to take the hill.  In response

3   to Lyft's mall meet-up analogy, Quartz argues that the first user must be "omniscient" in order to

4   know when she and a friend are in the same region.  Quartz ignores that this could be done by a

5   third person watching the first two.  And, again, Quartz's distinction relies entirely on unclaimed

6   requirements.  Opp. 7.  Lyft's analogies accurately track the *claims* and properly serve to illustrate

7   the longstanding practices and mental steps at their core.

8          Quartz's argument that the '443 Patent claims are not abstract because they are directed at a

9   "specific technique" for "improved functionality" is divorced from the claim language.  Quartz

10   points to nothing in the *claims* that demonstrate a "specific technique."  That is unsurprising because

11   the claims do not disclose *how* to perform any of the claimed functions.  *See* Mot. 6–8.  They are

12   purely functional, which "underscores the breadth and abstract nature of the idea embodied in the

13   claims." *Affinity Labs*, 838 F.3d at 1259.  Unable to point to any specific claim language, Quartz

14   argues that the Court should focus on the '443 Patent's purported innovations described in the

15   specification.  Opp. 8–9.  As discussed above, however, this attempt to conflate the § 101 analysis

16   with § 102 novelty analysis has been squarely rejected.  *Intell. Ventures I LLC*, 838 F.3d at 1315

17   (novelty is of "no relevance in determining whether the subject matter of a claim falls within the §

18   101 categories of possibly patentable subject matter")

19               **2.      The Claims Lack an Inventive Concept**

20          Quartz argues that Lyft fails to show the abstract idea of the '443 Patent lacks an inventive

21   concept because Lyft has not shown the abstract idea was "conventional" or "known."  Opp. 9–11.

22   Lyft need not do so.  "[A] claim for a *new* abstract idea is still an abstract idea." *SAP America, Inc.

23   v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) (quoting *Synopsys, Inc*, 839 F.3d at 1151).

24   That is true "no matter how groundbreaking the advance." *Id.* at 1170.  And here, as illustrated by

25   Lyft's analogies, the abstract idea is not even new.  Further, the specification states that the claimed

26   functionality could be implemented by well-understood and conventional components such as GPS

27   and mobile phones.  '443 Patent at 3:52-64; Opp. 5.

28          Quartz misunderstands what a patent-eligible technological improvement is.  Using portable

communication device, e.g., a known GPS-enabled phone, to perform its ordinary functions of determining locations and notifying people does not "improve the functioning of the [device] itself" any more than using a generic computer to perform "intermediated settlement"—even if the method had never been performed on a computer before. *Alice,* 573 U.S. 225–26.

The claims are extremely broad. Quartz touts alleged improvements to cell phones and GPS at the time of the '443 Patent, despite that the claims do not recite cell phones or GPS. In fact, the claims do not require the use of ***any specific technology*** for implementing the abstract idea. And the ordered combination "simply recite[s] the concept" of notifying someone they are in the same area as someone else and determining a common meeting point. *Alice,* 573 U.S. at 225. Quartz cannot assert the abstract idea as the inventive concept. *See BSG Tech LLC*, 899 F.3d at 1290.

Furthermore, Quartz admits that "the underlying rationale behind the eligibility inquiry" is one of preemption. Opp. 1. And the '443 Patent claims raise that very concern. The claims are functional, result-oriented, and encompass nearly all ways of determining locations of devices of two people, determining a common meeting point, and notifying the users. The claims are not even limited to a particular technical environment or a particular field, which further illustrates the preemption concern and abstract nature of these claims. There is no inventive concept.

### 3. Claim 1 Is Representative

Quartz argues that claim 1 is not representative because claim 3 recites the additional requirement of "determining whether the first user has permission to locate the second user." In support, Quartz suggests that this limitation is incompatible with Lyft's proposed analogies. Opp. at 8. First, claim 3 recites no details regarding ***how*** permission is determined, and this entirely functional limitation neither departs from the abstract idea at the heart of claims nor provides an inventive concept. Second, in Lyft's analogy, the commander unquestionably has permission and the radio operator (like anyone) gives permission simply by responding, never mind the prevalent use of covert authentication codes at the time. In any event, the claim adds nothing more than the idea of determining permission, which is itself abstract and cannot provide an inventive concept. *See, e.g.*, *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017 (Fed. Cir. 2017) (holding claims directed to "providing restricted access to resources" abstract and ineligible).

**B.      The '871 Patent Claims Patent-Ineligible Subject Matter**

The '871 Patent claims are directed to nothing more than the abstract idea of remotely determining defective operational conditions in an automobile by collecting data, wirelessly transmitting it, analyzing it remotely, and sending it back.  Quartz's argument that the '871 Patent claims improvements is insufficient to convert its claims into patent-eligible subject matter.

### 1.      The Claims Are Directed to an Abstract Idea

Quartz's characterization of the claims is consistent with Lyft's abstract idea. In particular, Quartz asserts that the '871 Patent claims are "directed to improving the functioning of the automotive system by facilitating the detection and correction of defective conditions beyond what pre-existing simple on-board diagnostics previously accomplished."  Opp. 13.  In other words, the claims accomplish monitoring and correcting defective operational conditions via continuous wireless transmission.  Quartz makes four arguments to try to salvage the claims, but each fails.

*First*, because the '871 Patent claims fail to explain *how* to achieve the claimed results, Quartz points to the specification to fill in the details.  Opp. 15–16.  But the claims themselves do not include these limitations, and—as discussed—the focus of the § 101 inquiry is on the claims themselves and the specification cannot save overly broad claim language.  *See* Section II, *supra*, at 2–4.  Further, the details Quartz relies on—such as those described in Figures 3 and 4 of the '871 Patent—merely provide instructions on how to carry out the claimed abstract idea on generic devices.  These steps are neither claimed nor add anything to the § 101 analysis.  *See Intel. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370–71 (Fed. Cir. 2015) ("Steps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility.").

*Second*, Quartz draws meaningless distinctions to try to distinguish the steps of claim 10 from other claims that courts have found abstract.  For example, Quartz suggests that the '871 Patent is unlike the ineligible patent in *Chamberlain* because the court there held that the only improvement over the prior art was that "status information was communicated wirelessly rather than over a conventional hard-wired connection."  Opp. 15 (citing *Chamberlain Grp., Inc.*, 935 F.3d at 1346).  But Quartz does not explain how the patent in *Chamberlain* is any different from the '871 Patent: *Chamberlain* clarified that wireless transmission (*i.e.*, one purported advance in the '871 Patent), is

1  nothing more than an abstract idea. *See Chamberlain Grp., Inc.*, 935 F.3d at 1346–47.  Nothing is
2  special about the wireless transmission claimed here, which uses conventional components and
3  means.  *See* '871 Patent at 2:36–37 ("[T]he wireless transmission system used for the present
4  invention may conveniently be wireless cellular telephonic systems."); *see also id.* at 3:59–63.

5      Quartz also argues that *Electric Power* and *Uniloc* do not stand for a "broad rule that real-
6  time data transmission is also an abstract idea" because the cases "must be read within the context
7  of the facts it was decided upon."  Opp. 15.  In both cases, the Federal Circuit held the challenged
8  claims, involving real-time data transmission, ineligible because they were directed to abstract ideas
9  and lacked an inventive concept.  *See Elec. Power Grp., LLC v. Alstom S.A.,* 830 F.3d 1351(Fed.
10  Cir. 2016); *Uniloc USA*, 772 F. App'x 890 at 902.  Quartz's only attempt at distinguishing the '871
11  Patent claims is to point out that the prior art previously had "no real-time remote diagnostic station
12  support at all" and the patent therefore "applies wireless technology to accomplish something never
13  done before."  Opp. at 15.  This notion asserts the routinely rejected argument that applying an
14  abstract idea on a computer transforms it into a patent-eligible invention.  Where "the focus of the
15  claims is not on such an improvement in computers as tools, but on certain independently abstract
16  ideas that use computers as tools," the claims are directed to an abstract idea.  *Elec. Power*, 830 F.3d
17  at 1354; *SAP America, Inc.*, 898 F.3d at 1163 ("[A] new abstract idea is still an abstract idea.")

18      *Third*, Quartz again impermissibly blurs the line between § 101 eligibility and § 102 novelty
19  by generally arguing that "fact issues remain regarding the claimed advance over the prior art."
20  Opp. 16.  Quartz argues that "Lyft fails to present any evidence of the state of the prior art."  *Id*. at
21  15.  But Lyft is not required to present evidence regarding the state of the prior art—nor is the Court
22  required to consider it—to determine whether the '871 Patent claims an abstract idea.  *See*
23  *CardioNet*, 955 F.3d at 1374.  Further, the '871 Patent itself makes clear what is "conventional" and
24  part of the prior art.  For instance, the specification states that everything about the patent is
25  "conventional" except the wireless transmission of real-time data and providing corrective and
26  informative data back to the automobile.  *See* '871 Patent, 4:35–52.

27      *Fourth*, despite arguing that the factual record is undeveloped, Quartz also argues that the
28  claims are patent-eligible because they are an improvement on the prior art.  Opp. 13.  Specifically,

1    Quartz argues that the '871 Patent improves diagnostics efficiency through remote and wireless

2    diagnostics and correction.  Opp. at 15.  But adding efficiency does not make an idea non-abstract.

3    *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017) ("The fact

4    that an identifier can be used to make a process more efficient, however, does not necessarily render

5    an abstract idea less abstract."); *see also PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310,

6    1318 (Fed. Cir. 2021).  Here, the purported invention gains efficiency only through continuous

7    wireless transmission, or automation, rather than any improvement in computers as tools.  The steps

8    listed in the '871 Patent method claims simply use a generic computer as a tool to implement what

9    has otherwise been done by humans, *e.g.*, a teenager calling his dad about car problems and the dad

10   walking his son through fixing the car problem based on what is conveyed to him.

11              **2.       The Claims Lack an Inventive Concept**

12           The '871 Patent claims also lack an inventive concept.  Although Quartz asserts that the

13   patent incorporates a specific technical improvement "rooted in computer technology," the technical

14   improvement boils down to the combination of several generic remote elements (*e.g.*, a diagnostic

15   station) used in their ordinary manner.  Opp. 13, 16.  Rather than identifying any particular inventive

16   concept, Quartz argues only that the "inventors were able to achieve a technical solution—more

17   sophisticated and efficient diagnostic capabilities than previously disclosed by the art . . . and an

18   improvement in the functioning of the automobile."  Opp. 16.  First, limiting the scope of the claims

19   to automobiles does not transform it into a patent-eligible idea.  *Elec. Power*, 830 F.3d at 1354–55

20   ("Limiting the claims to [a] particular technological environment . . . is, without more, insufficient

21   to transform them into patent-eligible applications of the abstract idea . . . .").  Second, Quartz's

22   arguments on an inventive concept again confuse § 101 eligibility requirements with § 102 novelty.

23   Applying an abstract idea on a computer for the first time may be novel, but it is neither inventive

24   nor patentable without "significantly more."  *See Alice*, 573 U.S. at 221–26.

25           Further, the '871 Patent itself makes clear that the abstract idea is executed by generic and

26   conventional components.  Citing *CosmoKey*, Quartz suggests that this Court cannot make a finding

27   on the ordered combination based on the current record.  Opp. 16.  *CosmoKey*, however, does not

28   establish a rule that Lyft must show that the ordered combination was conventional.  *See* Section II,

1    *supra*, at 2–4.  Here—where the patent holder points to the abstract idea itself as the inventive

2    concept and the patent's specification makes clear that the invention relies on conventional

3    components—Lyft does not need to.  *Id.*  The combination of several abstract ideas does not

4    transform a claim into a non-abstract idea.  *See PersonalWeb Techs.*, 8 F.4th at 1316–18; *Elec.*

5    *Power*, 830 F.3d at 1354.

6            **3.**     **Claim 10 Is Representative**

7        Claim 10 is representative of asserted claims 1–8 and 10–17.  Quartz argues otherwise

8    without providing any support.  In fact, Quartz admits that the system claims (1–8) are not materially

9    different from the method claims (10–17).  Opp. 14.  As for the claims depending from claim 10,

10   Quartz recites the limitations of those dependent claims but fails to explain how those limitations

11   add anything more than additional abstract ideas.  Quartz suggests that Lyft "mischaracterizes [claim

12   10], as well as the specification, which describe a system for 'monitoring and correcting' operational

13   conditions and recite limitations beyond mere wireless data transmission." Opp. 15–16.  But as Lyft

14   noted in its motion, claim 11 recites the step of "correcting said defective operational conditions,"

15   and correcting or controlling operational conditions is itself an abstract idea.  '871 Patent, at cl. 11;

16   Mot. 10.  Each of these dependent claims fail to add anything more than additional abstract ideas or

17   functional language claiming the results.  *See* Mot. 14.

18       **C.**     **The '215 Patent Claims Patent-Ineligible Subject Matter**

19        The '215 Patent claims are directed to an abstract idea and lack an inventive concept.  Quartz

20   spends pages discussing the alleged problems being solved and other details in specification but

21   fails to meaningfully engage the broad claim language.  The ***claims*** recite high-level steps written

22   in entirely functional language and fail to recite ***how*** any of the Quartz's alleged improvements are

23   implemented.  The claims are thus ineligible for patent protection.

24            **1.**     **The Claims Are Directed to an Abstract Idea**

25        The parties largely agree on the idea to which these claims are directed.  Quartz states that

26   the inventors sought to "provid[e] methods that improve response time to events associated with

27   managed IT devices and ensure that someone qualified and available will respond." Opp. 18.  Lyft

28   similarly characterized the abstract idea of these claims as: managing IT devices by assigning

1   responsibility for problems to someone qualified and available to respond.  The key difference is

2   that Quartz attempts to find eligibility by identifying an end goal—improving response time.  But

3   this purported limitation is not recited in the claims and the claims do not explain **how** that goal is

4   accomplished.  These claims are thus directed at an abstract idea.  *See, e.g.*, *Two-Way Media Ltd.*,

5   874 F.3d at 1337 (claim "using result-based functional language" directed to an abstract idea

6   because it did "not sufficiently describe how to achieve these results in a non-abstract way").  Quartz

7   raises two arguments to try to avoid this result—each of which fail.

8       *First*, Quartz again improperly relies on details and alleged improvements described in the

9   specification that are not recited in the claims.  *See* Opp. 17–19.  Quartz discusses problems in the

10  prior art that the claims allegedly solve, but the claims stop short of reciting anything more than the

11  abstract idea of solving those problems.  For example, Quartz argues that the admittedly known and

12  "conventional" IT management systems that used email, rather than instant messaging, could

13  experience "significant delay," may not notify the right person, did not "detect whether the

14  administrator is available" or "identify other available administrators who can immediately respond

15  to the event," and "there was no guaranteed real-time feedback."  Opp. 17–18.  Quartz posits that

16  the inventors had the idea to use other conventional technologies, such as instant messaging

17  programs with presence detection, to automatically detect technician availability and to facilitate

18  real-time communications.   But the applicant simply claimed the functions of "receiving"

19  information, "selecting" a candidate, and "assigning responsibility" without any details regarding

20  **how** other than being automated on a computer.  Claim 5 does not even require instant messaging

21  or any kind of real-time communication that Quartz touts as a claimed improvement.[3]  *Id.*  As Quartz

22  admits, the claims are broad and "not limited to using instant messaging to improve response time."

23  *Id.*  "The § 101 inquiry must focus on the language of the Asserted Claims themselves."  *Synopsys,*

24  *Inc.*, 839 F.3d at 1149 (citing *Accenture*, 728 F.3d at 1345).[4]  These "details from the specification

25  _____

26  [3] The only claim that recited "real time" communication was claim 2, which Quartz disclaimed.
    Although Quartz argues that "there are numerous reasons" it may have disclaimed Claims 1, 2 and
    4 that might not relate to validity or eligibility, it fails to provide any such reason.  Opp. at 23.

27  [4] Quartz attempts to cast *Accenture* as an outdated "pre-*Alice*" opinion to rebut Lyft's "seemingly
    fitting soundbite from *Accenture*" that the '215 Patent is "a 'do it on a computer' patent."  Opp. at
28  21-22.  First, there are 31 Federal Circuit opinions that cite *Accenture*, and 29 of those issued after

1    cannot save a claim directed to an abstract idea that recites generic computer parts." *Id.*

2         Although Quartz contends that the claims of the '215 Patent are broad enough to cover an

3    embodiment where response times to IT problems are improved, the claims do not recite how to

4    achieve any such improvement.  The claims attempt to broadly preempt managing an IT device by

5    assigning responsibility for a problem to someone qualified and available to respond, whether or not

6    that person actually resolves the problem or whether there is any improvement in response time.

7    Neither of those are required by the ***claims***.  Further, the claims do not explain ***how*** alerts are

8    received, ***how*** availability information is received (only recited in claim 5), ***how*** a qualified and

9    available candidate is selected, or ***how*** the responsibility is assigned.  It is irrelevant that the

10   "specification provides further details for implementing" aspects of the claims, "such as assigning

11   responsibility to the candidate nearest the device issuing the alert or prioritizing assignments of

12   varying urgency among available candidates."  Opp. 19.  Those details are not ***claimed***—indeed,

13   the claims purport to cover *any* way of assigning responsibility.  Because they recite "functions in

14   general terms, without limiting them to technical means for performing the functions," they are "so

15   result-focused, so functional, as to effectively cover any" implementation of the abstract idea.  *Elec.*

16   *Power,* 830 F.3d at 1350, 1353, 1356.

17        Quartz also argues that its allegations of infringement against Lyft's "sophisticated, tangible

18   system" support finding eligibility because "[t]here is nothing abstract about the accused Lyft

19   platform."  Opp. 21.  Not only is that unsupported, it is illogical.  The fact that Quartz reads these

20   claims so broadly as to encompass "the transportation services that the platform supports" (*id.*)

21   confirms the boundless and abstract nature of these claims, flatly contradicting Quartz's argument

22   that they recite some specific improvement in IT management systems.  According to Quartz, the

23   specification provides no reason the claims are limited to "responding to IT problems" (Opp. 21),

24   despite that being the entire focus of the patent.  '215 Patent at Abstract.

25        *Second*, Quartz wrongly contends that Lyft oversimplifies the claimed abstract idea through

26   its analogies.  Opp. 20.  Lyft's analogies illustrate the longstanding practice at the heart of these

27   _____
     *Alice*.  None have called into question *Accenture*, which is still good law.  Second, the "seemingly
28   fitting soundbite" that Quartz complains of is not from *Accenture*.  As Lyft properly cited in its
     Motion, it is from *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.,* 916 F.3d 1363, 1367 (Fed.
     Cir. 2019), a case that Quartz does not cite or rebut.  Mot. at 20.

claims and demonstrate how it could be performed in the human mind or with pen and paper. As explained in Section II, above, Quartz fundamentally misunderstands why and how such analogies are useful. Courts have already held that supplying generic and conventional components and functionality are insufficient to save a claim from abstraction and thus need not be included in an analogy. *See* Section II, *supra*, at 2–4.

Although Lyft's analogies do not include "managed IT devices," IT devices (and specifically, "managed IT devices") were well-known and conventional at the time the '215 Patent was filed, as confirmed by the specification and admitted by Quartz. Mot. 21–22; *see, e.g.*, '215 Patent at 1:6-10, 1:36–59 4:57–65, 5:51–6:6, 8:26–36; Opp. 17 (admitting a "conventional approach" in "conventional systems" "involved sending an email to an administrator when a problem arose"); *see also id.* at 20 (describing "conventional systems" that included a "managed IT device"). Thus, "managing IT devices" is nothing more than a generic technological environment, and "that does not make the claims any less abstract." *TLI*, 823 F.3d at 613. In fact, Quartz argues that the claims apply to any "computer environment in a particular industry." Opp. 22.

Lyft's analogies appropriately track the remaining aspects of the claims, namely, assigning responsibility for problems to someone qualified and available to respond. Quartz does not substantively address Lyft's ship-captain analogy, which, excepting the admittedly known and conventional computer components and functionality, tracks every step of every asserted claim. Mot. 19 (mapping analogy to claim steps). Rather, Quartz simply says that this analogy is "unpersuasive" and "not useful," without any explanation as to why. Opp. 20. Quartz then criticizes Lyft's dishwasher analogy because the blinking light on the dishwasher is not an "alert." *Id.* Even if, in addition to pen and paper, a telephone was needed, the use a telephone or other conventional communication technology does not change the analysis. *Id.* (arguing the person "must conduct research and phone conversations to gather this information"). It is this type of abstract manual process that these claims seek to automate using a generic computer.

Notably, in its criticism, Quartz refuses to address the claim language. Claim 5 simply says "receiving availability information," with no limitations on ***how***, and claim 14 simply says "determining if the candidate is available," again with no limitations on ***how***. Claim 5 does not even

1   require using the received information, as that is the sole limitation of dependent claim 6.  Aside

2   from generic computer components and functionality, the dishwasher analogy tracks the process of

3   the claims by using the phone book to select certified technicians, calling them to explain the

4   problem and to see if they are available, choosing one, and making and confirming an appointment,

5   and if the appointment is not confirmed within a reasonable time, finding someone else that is

6   available.  This illustrates that, once the generic computer components and functionality are set

7   aside, the remaining limitations of the claims as a whole "simply recite the concept" of assigning

8   responsibility for problems to someone qualified and available to respond.  *Alice*, 573 U.S. at 225;

9   *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1279 (Fed. Cir.

10  2012) ("When the insignificant computer-based limitations are set aside from those claims that

11  contain such limitations, the question under § 101 reduces to an analysis of what additional features

12  remain in the claims.") (citing *Mayo*, 566 U.S. at 78).

13              **2.      The Claims Lack an Inventive Concept**

14          Quartz again fails to identify any inventive concept.  Its reliance on four Federal Circuit

15  opinions to argue that the '215 Patent is a patent-eligible improvement—*TecSec*, *Ancora*, *Packet

16  Intelligence*, and *Data Engine*—is misplaced. *See* Opp. 20–21.  Unlike the claims in those cases, the

17  claims here fail to recite "a ***specific*** technique … to solve a ***specific*** computer problem."  *Ancora

18  Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018);

19  *see also Packet Intelligence LLC v. NetScout Sys., Inc.,* 965 F.3d 1299, 1309 (Fed. Cir. 2020).

20  (claiming "a ***specific*** improvement in computer technology); *Data Engine Techs. LLC v. Google

21  LLC*, 906 F.3d 999, 1008 (Fed. Cir. 2018) (claims "directed to a ***specific solution*** to then-existing

22  technological problems ***in*** computers.") (all emphases added).

23          In *TecSec*, the Court explained that the "directed to" inquiry looks to "what the patent asserts

24  to be the focus of the ***claimed*** advance over the prior art." 978 F.3d at 1292 (emphasis added).  But

25  here, the ***claims*** fail to capture any of Quartz's alleged advances.  As *TecSec* explains, "[i]n cases

26  involving software innovations, this inquiry often turns on whether the claims focus on specific

27  asserted improvements in computer capabilities or instead on a process or system that qualifies an

28  abstract idea for which computers are invoked merely as a tool."  *Id.* at 1293.  The claims here fall

into the latter category.  They are devoid of any *specifics* as to *how* to implement the claimed steps.  They do not recite any improvement to the functioning of a managed IT device or computer capability.  They do not require that the person assigned actually resolve whatever problem the device is experiencing, and they certainly do not require that that be done within some improved amount of time.  They do not require the identified person to "immediately respond" or guarantee "real-time feedback," the other improvements that Quartz asserts (Opp. at 17–18).  Quartz appears to argue that these method claims recite a specific, patent-eligible implementation because they contain discrete steps.  That is true for every method claim that has been found ineligible under § 101, and that circular logic cannot save these claims.  To the extent the claims capture any of the alleged improvements, they simply fail to do so in a non-abstract way.  Rather, the improvements, if any, stem from automating the process using conventional computer technologies.  That is insufficient.  *Credit Acceptance*, 859 F.3d at 1055.

### 3.    Claim 5 Is Representative

Claim 5 is representative because all the claims are "substantially similar and linked to the same abstract idea."  *Content Extraction*, 776 F.3d at 1348 (internal citation omitted).  Claim 6 simply recites using the availability information in the process, and claim 7 simply recites determining a plurality of qualified candidates and choosing one.  Notably, Quartz does not rely on either of those claims to provide an inventive concept, which they do not.

Quartz's repeated focus on claims 8, 15, and 16 is misplaced.  Opp. 18–19 (incorrectly arguing these claims "add further meaningful limitations"), 23 (asserting these claims provide an inventive concept).  Claim 8 does not require the method "*chose* a candidate closest to a managed device" as Quartz alleges.  *Id.* at 23 (emphasis added).  Claim 8 merely recites "determining" which candidate is "located closest to the managed device."  That is abstract.  Not only does the claim fail to provide any details regarding *how*, the claims do not actually require *selecting* the person who is closest, just that the determination is made.  In any event, Quartz cannot argue credibly that selecting the person closest to a problem, without more, is somehow inventive.  Similarly, setting aside the conventional computer functionality, the limitations of claim 15 add nothing inventive and merely require identifying a second qualified candidate and determining if they are available.  It does not

1    explain *how* or even require sending the second candidate an instant message, assigning

2    responsibility, or receiving a reply. Claim 16 recites the wholly conventional functionality of well-

3    known and commercially available instant messaging systems, which adds nothing inventive. *See*

4    *Bancorp Servs., L.L.C*, 687 F.3d at 1279 ("When the insignificant computer-based limitations are

5    set aside from those claims that contain such limitations, the question under § 101 reduces to an

6    analysis of what additional features remain in the claims.") (citing *Mayo*, 566 U.S. at 78). Where

7    the claims merely recite an "application of an abstract idea using conventional and well-understood

8    techniques," there is no inventive concept as a matter of law. *BSG Tech LLC*, 899 F.3d at 1290.

9            **D.      The '275 Patent Claims Patent-Ineligible Subject Matter**

10           The '275 Patent claims are also directed to an abstract idea and lack an inventive concept.

11   Quartz spends almost two full pages of its opposition describing the "proper context" of the '275

12   Patent for purposes of the Court's 101 analysis. Opp. 24–25. But Quartz's characterization of the

13   '275 Patent—which is similar to Lyft's—does not fundamentally change the fact that the '275

14   Patent's claims are: (1) directed at collecting, analyzing, and transmitting data; (2) functional in

15   nature; and (3) directed at a longstanding human practice. Mot. 23–29.[5] For instance, the parties

16   agree that "[t]he '275 Patent concerns adjusting vehicle timing in a transportation network" to

17   reduce passenger wait time. Opp. 24; *see also* Mot. 1, 23. But Quartz argues (without explanation)

18   that Lyft's analysis is flawed on the basis that Lyft fails to discuss the reduction of the *cumulative*

19   wait time of the passengers. Opp. 24. Quartz is wrong. Lyft discusses that aspect of the purported

20   invention throughout its analysis, including in its analogy. Mot. 23–29.

21           Quartz then argues the Court should find that the '275 Patent is not directed at an abstract

22   idea for two primary reasons: (1) the patentee overcame an initial rejection from the examiner on

23   101 grounds; (2) the additional limitation that allegedly made the claims patent eligible was an

24   advance over the prior art. Opp. 24–28. Quartz further argues that the '275 Patent contains

25   "inventive concepts" because it recites the combination of conventional elements in a way that

26   would have been unknown at the time. *Id*. 28–29. Each of these arguments fails.

27           **1.      The Claims Are Directed to an Abstract Idea**

28   ───────────────
[5] The same is true for the '275 Patent's dependent claims. Quartz recharacterizes them in its brief, but it fails to explain how its characterizations change the analysis. Opp. 25, 29. They do not.

1        Quartz argues that the '275 Patent is not directed at an abstract idea because the examiner

2   allowed Claim 1 after the patentee added language that the processing in the claim included

3   "processing to determine an adapted timetable for providing a reduced cumulative wait time."  *See*

4   Opp. 25–28.  Quartz acknowledges that the examiner found the remaining elements of the claim

5   abstract and lacking an inventive concept.  Opp. 26.  But it urges the Court to find this additional

6   "processing includes processing" limitation renders the claim patent-eligible because it is

7   supposedly an advancement over the prior art.  *Id*.  The Court should reject the invitation to do so.

8        *First*, and as a threshold matter, Quartz's notion that overcoming a § 101 rejection makes a

9   patent unassailable is wrong.  Opp. at 27.  "The initial determinations by the PTO in determining to

10  grant the application are entitled to no deference."  *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,

11  719 F.3d 1346, 1357 (Fed. Cir. 2013); *see also Merad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313,

12  1322 (Fed. Cir. 2005) ("[A] court is not bound by the PTO's actions and must make its own

13  independent determination of patent validity.")  Another patent holder advanced a similar argument

14  in this District, which the Court rejected and found ineligible claims that had previously overcome

15  an examiner's rejection under § 101.  *Fitbit Inc. v. AliphCom*, No. 16-CV-0118-BLF, 2017 WL

16  819235, at *2, *15–18 (N.D. Cal. Mar. 2, 2017).  There, the examiner withdrew the § 101 rejection

17  after the patentee amended the claims to add that a notification be displayed at a "specified date and

18  time" or within a "time window."  *Id.* at *2.  The Court still found that the claims were directed to

19  an abstract idea, the additional limitations supplied no inventive concept, and that the claims were

20  thus ineligible.  *Id*. at *15-18.  The Court held that it "need not defer to an examiner's conclusions

21  on patent eligibility, on underlying observations regarding the state of the art."  *Id*. at *18.

22       *Second*, Quartz's "processing includes processing" limitation does not fundamentally alter

23  the analysis that applies to the remaining elements, which the examiner did find directed to ineligible

24  subject matter.  Quartz fails to explain how the claim is anything more than analyzing collected data

25  ("processing") and outputting the results of the analysis ("providing a reduced cumulative wait

26  time"), (Opp. 25–28), which the Federal Circuit has repeatedly found abstract, (Mot. 25–26).

27  Without more, Quartz simply contends that "[t]his oversimplifies the '275 claims," but its

28  supposedly more complicated formulation—"processing data to optimize vehicle and passenger

---

1    flow in the transportation network, determining whether a momentary wait time would benefit

2    passengers, and adjusting the timetable accordingly" —adds nothing more.  Opp. 26.  It is the same

3    "providing . . . [of] an output based on a processing of the passenger information" that the examiner

4    found abstract.  *See* '275 Patent at Claim 1.  Further, Quartz does not respond to the fact that—even

5    with this limitation—the claims of the '275 Patent are results-focused without specifying ***how*** the

6    claim must be performed.  *See* Opp. 25–28.  The claims broadly cover any implementation of the

7    abstract idea, which renders them invalid.  *See Elec. Power Grp.*, 830 F.3d at 1356.

8          *Third*, the Court should reject Quartz's argument that the additional "processing" limitation

9    renders the claims of the patent non-abstract "because the amended claim discloses an advance over

10   the prior art."  Opp. 26.  The Federal Circuit has developed many approaches to determine whether

11   an idea is abstract for purposes of § 101, but whether the purported invention is an advancement

12   over prior art (*e.g.*, novel) is not one of them.  *See CardioNet*, 955 F.3d at 1374.  The Federal Circuit

13   has held that step one includes assessing "the focus of the claimed advance over the prior art," but

14   that is just to define the purported invention and not to evaluate whether that purported invention is,

15   in fact, abstract.  *See C.R. Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1382–83 (Fed. Cir.

16   2020).  Quartz's contention that an alleged advance over the prior art should end the inquiry

17   collapses the analysis of a patent's validity under §§ 102 and 103 with 101, which the Supreme

18   Court has rebuked.  *Mayo*, 566 U.S. at 91.

19         *Finally*, Quartz's peripheral arguments—that the '275 Patent Claims do not fit into an

20   established category of abstract ideas and are not a longstanding human practice—fare no better.

21   Opp. 27–28.  Quartz does nothing to substantiate these assertions.  *Id.*  It is unclear how

22   "determine[ing] an "adaptable timetable for providing a reduced cumulative wait time" in a

23   transportation network is not a "method of organizing human activity," which Quartz acknowledges

24   is one of the categories the Supreme Court has found abstract (*Alice*).  *See* Opp. 28.  Quartz also

25   argues the '275 Patent does not claim a longstanding human practice by attacking Lyft's analogies.

26   It can only do so, though, by improperly arguing that the analogy does not meet limitations that do

27   not actually exist in the claim—such as that the system has to be "automated"—and purposefully

28   misreading the analogies in the narrowest way possible.  *See* Opp. 27.  Of course, airplane operators

---

1   track and process passenger location information for the purpose of adjusting and providing an

2   adapted timetable of departures for multiple vehicles when multiple flights with many passengers

3   connecting to different locations are delayed.   Likewise, the collection of passenger location

4   information and the evaluation of the cumulative wait time of multiple passengers would

5   undoubtedly be at play in a Mayflower-type situation.   And, notably, Quartz has no response to the

6   fact that any of this processing—whether it was done on the Mayflower or is done by cruise ship

7   and airline operators—could be done with pen and paper.   It can, and the '275 Patent itself

8   acknowledges as much.   Mot. 28.

9         **2.      The Claims Lack an Inventive Concept**

10         Quartz argues that there is insufficient evidence to show that the elements of the asserted

11   claims of the '275 Patent were conventional and well-known and that—even if they were—it is not

12   clear that the combination of them was too.   Opp. 28–29.   In doing so, Quartz merely relies on the

13   abstract idea itself to establish an inventive concept.   *Id.*   The Federal Circuit has rejected this

14   approach and the need to engage in factual questions of whether any such alleged inventive concept

15   was non-routine or unconventional.   *BSG Tech LLC*, 899 F.3d at 1290–91.   Regardless, Quartz does

16   not identify any specific elements of the claims—or combination thereof—that must be performed

17   by unconventional elements and/or conventional elements in an unconventional combination.   It in

18   fact cannot do so because—as highlighted by the '275 Patent specification and Lyft's analogies—

19   the claims are both broad and completely silent on how their claimed functions are to be performed.

20   As such, even if they could be performed by unconventional elements in unconventional

21   combinations, they also could be performed by conventional elements in conventional

22   combinations.   Quartz does not contend otherwise.   The Court should find that there is no inventive

23   concept, and the '275 Patent claims are ineligible for claiming unpatentable subject matter.

24   **IV.   CONCLUSION**

25         For the foregoing reasons, Lyft respectfully requests the Court grant its motion.

26

27

28

1

Dated: February 2, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

*/s/ Karan Singh Dhadialla*
Jeremy J. Taylor (SBN 249075)
Karan Singh Dhadialla (SBN 296313)
**BAKER BOTTS L.L.P.**
101 California Street, Suite 3600
San Francisco, CA 94111
Tel: (415) 291-6200
Fax: (415) 291-6300
jeremy.taylor@bakerbotts.com
karan.dhadialla@bakerbotts.com

Syed K. Fareed (admitted *pro hac vice*)
Clark Oberembt (admitted *pro hac vice*)
**BAKER BOTTS L.L.P.**
98 San Jacinto Blvd #1500
Austin, Texas 78701
Phone: (512) 322-2500
Fax: (512) 322-2501
syed.fareed@bakerbotts.com
clark.oberembt@bakerbotts.com

Danny David (admitted *pro hac vice*)
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, Texas 77002
Phone: (713) 229-4055
Fax: (713) 229-2855
danny.david@bakerbotts.com

*Attorneys for Plaintiff/Counterclaim Defendant Lyft, Inc.*